DAWKINS, J.
Plaintiff claims the sum of $12,347 as damages for personal injuries, etc., alleged to have been occasioned by a collision of his motorcycle with the automobile of the defendant.
Defendant excepted to the petition on the ground of vagueness, and plaintiff was ordered to amend, which was accordingly done, and thereupon an exception of no cause of action was filed and subsequently overruled. Answer was then filed admitting some of the allegations, including article 3, which, in the original petition, alleged indebtedness in the amount above stated; but we assume that this admission was made through an oversight and had reference to the article bearing the same number (3) in the amended petition which referred to defendant’s residence or domicile. In any event, the answer otherwise denies all liability and pleads con *689 tributory negligence on the part of the plaintiff.
The case was tried before a jury in the court below, and resulted in a verdict in favor of the plaintiff for the sum of $1,050. After an unsuccessful motion for a new trial, based upon the contention that the amount allowed was inadequate, plaintiff appealed. Defendant did not ask for a new trial, but has answered the appeal, and prays that xjlaintiff’s demands be rejected in toto.
In overruling plaintiff’s motion for a new trial, the judge below used the following language, to wit:
“Plaintiff seeks a now trial from a verdict of a jury in his favor, basing same on the inadequacy of the amount allowed. Defendant is not seeking a new trial, so we will confine this to the question of the amount.
“We think that the amount allowed was grossly inadequate, for plaintiff was badly hurt, and we hardly think that he will ever be the physical man he was before the injury.
“We think it will better serve the interest of both sides to allow the case to go on and get a final decision, rather than get a new trial with the attending expense and delay, and then one party or the other appeal it, as will undoubtedly be done. In our opinion the amount should at least be $5,000.
“The motion for the new trial is overruled.”
Exception of no cause of action.
[1] We take it that, inasmuch as nothing was said in the argument or in the brief in support of this exception, it has been abandoned. At any rate, we do not think it well founded. We assume that what defendant’s counsel had in mind, when filing it, was that plaintiff alleges he was attempting to pass defendant’s car on the left or wrong side, according to “the law of the road.” But we think this sufficiently overcome by the additional charge, made in justification of this course, that he was compelled to do so because of defendant’s violation of this rule and to avoid the collision. In such circumstances, it is not negligence to attempt to pass to the left. Each case must turn upon its own particular facts. Schick v. Jenevein, 145 La. 333, 82 South. 360.
Statement of Pacts.
The collision out of which this suit arises occurred a few miles out from the city of Shreveport, on the model or gravel road which runs in a northerly direction towards Belcher, the home of defendant. On the day of the accident defendant left 'Shreveport near 6 o’clock p. m. in a large Cadillac car, accompanied by his wife, son, and two other gentlemen, Messrs. Dixon and Hudson, the car being driven by defendant’s said son, Ashton Glassell, with Dixon also on the front seat, and the others on the middle and rear seats. Plaintiff had been employed in revetment work on the bank of Red river some 15 or 20 miles north of Shreveport, and, having finished his work for the day, was returning to his home in Shreveport in a southerly direction over the same road on a motorcycle. The two vehicles met, and, through circumstances which plaintiff attributes to the fault of the defendant’s said son, and which defendant in turn imputes to plaintiff, a collision followed, resulting in very serious injuries to the latter, and for which, as indicated above, the lower judge thought that he was entitled to recover, if anything at all, at least $5,000. As -is usual in such cases, the testimony is conflicting. Plaintiff claims that he. was traveling on the proper or right side of the road going south within some two or three feet of the west edge of the gravel, and continued to do so until he reached a point within a few feet of the automobile, in the expectation that the latter, which was also traveling on that side,'would turn to its right and permit him to pass; but that, upon reaching the point stated, he concluded that the ear would not concede him his side of the road, and, in order to avoid a head-on collision, he quickly turned *691 to Ms left and to the right of the automobile in the hope that he would be able to pass it on that side; that, instead, the car also turned in that direction, and they came together, the front wheel of his motorcycle striking the right fender of the automobile; and that he was thrown to the ground and injured as stated. Defendant, and the other occupants of the car who were sworn, admit that the automobile had been traveling on the west side of the road going north, but claim that this had been necessary in order to pass some wagons, and contend that the car had gotten back near the center of the road before the collision, and'that there was sufficient room to the west and left for the plaintiff to have passed in safety, but that he carelessly turned to the east in front of the automobile, thereby causing the accident.
Two witnesses, one white and the other colored, who seem to be without interest, sworn on behalf of , plaintiff in addition to himself, say that he was traveling on the extreme west side of the road, as was the automobile, until within a few feet of each other, when the motorcycle turned to the east and the collision occurred; while none, of the defendant’s witnesses contend that the auto was any further east than the center of the road. The witness J. W. Dixon, sworn on behalf of the defendant, and who says, because of their friendly relations, he would not like to see a judgment rendered against the defendant, as stated above, was sitting on the front seat of the car with young Glassell the chauffeur. He says that he was looking back and talking to those in the rear of the car, when his attention,was attracted by a remark of defendant’s wife to her son. We' quote some of his testimony on direct examination, as follows:
“Q. When you first saw him (meaning plaintiff), what portion of the road was he in?
“A. He was a little to the right.
“Q. When you first saw him coming?
“A. Well, it was this way. I was talking to Mr. Glassell. I was sitting turned around with my face to Mr. Glassell, talking,, and was not looking ahead, and all at once Mrs. Glassell said, ‘Watch out, Ashton!’ She said: ‘Watch out! Watch out! There is some body coming there! And I looked, and I saw him too, and then all at once it seemed that he commenced to switch and dodge, and I thought that he was going fast enough to get by, and then he slowed down, and I didn’t think that he was going to show speed enough to get by, and then the collision happened just like this (witness pops hands together).
“Q. And when you saw him, you were only a few feet away?
“A. Yes.
S: ‡ * * * * *
“Q. When the motorcycle struck the automobile, was there any room for him to pass on the west side of this machine?
“A. Plenty of room.
“Q. What side was it, or was it about the middle of the road?
“A. We were about the middle of the road.”
(Record, pp. 304, 305.)
On cross-examination:
“Q. Did you see the motorcycle coming, or not, until Mrs. Glassell called your attention to it by saying, ‘Watch out Ashton!’?
“A. No, sir.
“Q. When that remark was made, which way did you look,?
“A. To the front.
“Q. How far was the motorcycle away from the automobile when you heard this remark?
“A. It might have been 30, 40, 50, or it might have been 100 feet away.
“Q. The motorcycle was coming down on the right-hand side when you looked up?
“A. Yes.
“Q. The motorcycle was on the proper side of the road?
“A. Yes, sir.
:?s ❖ # * * * *
“Q. If the automobile had been in the center of the road, would Mrs. Glassell have made this remark when she saw the motorcycle on the right side, hugging the right side, and would there have been any chance for a collision?
“A. I don’t know.
“Q. I will ask you if the automobile was in the center of the road, and the motorcycle was kinder down on its extreme right edge of the road, at the time Mrs. Glassell made this remark, and you saw it coming on down the road, *693 and the automobile being in the middle of the road, was there any occasion for the accident?
“A. No occasion for either one, if both had kept on going straight ahead. There was no occasion for it. Now that is what I saw, when I'looked around. I think he could have got past. I think they both could .have passed, if they had just kept on. There was no occasion for the accident, and I don’t know just how it happened; only they seemed to keep dodging' each other until they came together.”
Further questions and answers ensue, in which the witness reiterated that he thought they could have passed if both had continued straight ahead, though the margin, we gather, he thought was rather narrow. On page 314 of the record, the cross-examination proceeds, and we quote again, as follows:
“Q. Well, now just listen to my question and give me a reasonable answer. The motorcycle, when you looked out and saw it, was coining down on its proper side of the road, towards Shreveport?
“A. Tes.
“Q. If the automobile had been in the middle of the road, there was not anything from preventing the motorcycle from continuing its course right on to town?
“A. If the automobile had been in the.middle of the road at that time, there would not have been any occasion for this accident, had the motorcycle kept straight ahead (evidently another question which the stenographer has confused for an answer) ?
“A. But I did not say that the car was in the middle of the road. I said that they struck after they got in the middle of the road.”
Defendant seems to explain the fact that his automobile was at one time on the west side of the road by laying it was necessary to pass the wagons. On this point we quote from the testimony of the driver, young Glas-sell, as follows:
“Q. When did you fiyst see the motorcycle?
“A. Just after I passed the wagon, I saw it a good distance up the road.
“Q. Had you passed the last wagon going toward Belcher, before you saw the motorcycle?
“A. No, sir; just as we were passing it. .
“Q. How. far away from the motorcycle?
“A. I could not say.
“Q. Half mile?
“A. I guess so.
“Q. Had he turned the corner around that curve ?
“A. Tes, this side óf the curve.”
On direct examination (page 253 of the record), defendant was asked how far away was the motorcycle when he first saw it, and Ms answer was:
“A. It was about a quarter of a mile, I think.”
And again®on page 258:
“Q. Mr. Glassell, even before your machine was turned towards the middle of the road, was there room for Mr. Potter to have passed to your left, that is to say, to his right?
“A. Before I turned to the left?
“Q. Tes.
“A. Of course, where we were going. First, before we began the turn, the wagons was to our right.
“Q. Was the motorcycle on the grass?
“A. I am satisfied that it was not on the grass. There was room enough for him to have passed me. We did not turn before because there was wagons there.”
[2, 3] We have quoted thus at length from the testimony of the defendant and his witnesses, for the reason that, while it is insisted by some of them, at times, that the automobile, at the moment of the collision, had reached a point near the center of the road, we think, when taken as a whole, it tends to corroborate the positive testimony of the plaintiff and his witnesses that, not only was the automobile on the left or west side of the road up to a point within a short distance of the accident, but that plaintiff, until he made the sudden turn to pass to the east of the car, was on his proper (west) side. We also think that it shows that the driver (the motorcycle being from one-fourth to one-half mile away) had ample time, after passing the last wagon, to have crossed over to the east or his rightful side of the road. It may be that by an actual measurement plaintiff could have squeezed by. the automo *695 bile, or if he had continued ahead the car would have turned sufficiently to the east, in time to have permitted him to pass. Let we cannot judge his actions by the rules and measurement of a calm calculation, but must determine this reasonableness in the light of the circumstances as they appeared to him in the situation in which he found himself, brought about, as we believe, by the failure of the driver of the defendant’s car to seasonably return to his own proper side of the road, when he had had ample opportunity to do so. We think it established, almost beyond a doubt, that plaintiff was traveling on the right side of the road from his standpoint, and leaving out of consideration the testimony, it does not seem reasonable, within the human probabilities, that he would have suddenly turned and dashed in front of the moving automobile, if he had thought there was room to pass on the west. The question is: Was his conduct that of a reasonably prudent man under the circumstances? We think it was.
[4] As stated by us in the case of Mattern v. Jenevine, the law of the road is a reasonable one and exacts of both parties an equal degree of care; if circumstances are such as to compel one to go the left, it is not negligence to do so, but, in the absence of such justifying conditions, the duty of each is to concede to the other his side of the road. 1-Ie who can, and does not, carries the burden of showing that his fault did not cause the accident. We think that the evidence shows that defendant did not turn to the right until a time when plaintiff had concluded that this would not be done; that there was not reasonably a sufficient space for plaintiff to pass with entire safety on the west; and that both started to turn to the east about the same moment, with the result that a collision occurred.
Hence a case of negligence is made out against the defendant, contributing proximately to the accident, and he is therefore liable for the damages occasioned.
There is much testimony in the record pro and con as to just where the vehicles came together in the road, plaintiff contending that it was on the west side, while defendant and his witnesses say that it was near the center, and that the right wheel of the automobile was east of the center of the road. In support of the latter contention, some witnesses swear that a Ford truck came up and passed to the west of the defendant’s car before it was moved after the collision; others say that the automobile had been moved and was turned around facing south before the truck arrived. However, even if there were sufficient room on the west for it (the truck) to pass, we think that it was due to the fact that the automobile' had swerved sufficiently to the east to bring about this situation after the emergency which resulted in the collision had arisen.
Quantum of Damages.
[5] The record shows that plaintiff was seriously injured, and, while he has in a measure recovered, it is very doubtful if he will ever again be the same strong and robust man that he was before the accident. He is some 25 pounds lighter in weight, and the doctors that testified say that he will be unable to do manual labor in the future, requiring any considerable physical exertion, without subjecting himself to the eminent danger of rupture, or strangulated hernia. They also say that the pain and suffering which he underwent were extremely severe. He received a blow over the abdomen which necessitated an operation the night of the day on which he was injured, and which, according to the doctor who performed it, revealed fecal matter in the cavity containing the bowels; but the rupture from which this substance was escaping was not found. The wound produced by the operation was sewed *697 up and a drainage tube put in to take care of this matter; the reason given for not finding and sewing up the ruptured bowel being that the patient could not remain under the anesthetic sufficiently long to permit this to be done. It was also stated by the physicians that the necessity of keeping this cavity open for the drainage is what left the wall of the abdomen weakened and rendered hernia probable. Up to the date of the trial, he had done some work at different jobs, driving an automobile, etc., but had not been able to return to the character of employment which he pursued before the injury — concrete construction worl&wkey;notwithstanding that he had been offered employment in that line.
At the date of the trial, plaintiff was 32 years old, and was receiving $115 per month when injured. His motorcycle was also damaged to the extent of $100 to $125.
Taking everything into consideration, we think plaintiff is entitled to recover the sum of $6,000 for his injuries and the damage to his motorcycle of $100.
For the reasons assigned, it is ordered, adjudged, and decreed that the judgment appealed from be and the same is hereby amended by allowing the plaintiff to recover of defendant the sum of $6,000 for his personal injuries, and $100 for damages to his motorcycle, and that defendant pay all cost.