## GOFF v. SINCLAIR REFINING CO. et al.
### No. 5063.

Court of Appeal of Louisiana.
Second Circuit.

June 29, 1935.

Hudson, Potts & Bernstein, of Monroe, for appellant.

Theus, Grisham, Davis & Leigh, of Monroe, for appellees Sinclair Refining Co. and Employers' Liability Ins. Co.

O. A. Easterling, of Monroe, for appellee F. T. Harkness.

TALIAFERRO, Judge.

Plaintiff brings this suit in tort for damages against George Fellows, F. T. Harkness, Sinclair Refining Company, and the Employers Liability Corporation, Limited, of London, England. Harkness and Fellows were made defendants on the theory that they were servants, agents, or employees of the Sinclair Refining Company, for whose negligence as such it was responsible, and the assurance corporation was joined as defendant, because it was thought and alleged that it had issued a contract of public liability and property damage insurance to the Sinclair Refining Company on the truck involved in the hereinafter described accident. It developed on trial of the case that no such insurance policy had issued, and the suit as to this defendant was dismissed on an exception of no cause and no right of action filed by it. There is now no complaint against this ruling. We shall hereinafter refer to the Sinclair Refining Company as the oil company.

For a cause of action, plaintiff alleges that said Harkness was, when the accident out of which plaintiff sustained injury and damage occurred, employed by the oil company to haul, deliver, market, and sell gas, oil, and other related products for and on behalf of said company, and especially was he employed to supply these products to the Sinclair owned, operated, and/or leased filling stations; and that in the discharge of said duties of his employment, Harkness was under the control of, supervised and directed by, the oil company; that he was paid a salary or commission based upon the quality and quantity of products sold by him for his employer; that the products until sold were the property of the company; that Harkness paid George Fellows for his services out of the salary and commission received by him from the company; and that Harkness and the company directed and controlled the work of Fellows.

Plaintiff further alleges:

"6. * * * that on or about May 11th, 1932, at about 3:00 o'clock P. M., your petitioner was driving a Ford Roadster, that he was proceeding in a westerly direction along the Dixie-Overland Highway, which is a paved highway, and about eighteen feet in width. About six miles west of the City of West Monroe, in Ouachita Parish, Louisiana, there is a curve and an incline or hill just a short distance east of the point of the hereinafter alleged accident.

"7. Your petitioner avers that the said George Fellows was driving a Chevrolet truck, equipped with tanks owned by Sinclair Refining Company actively engaged in the business of the said Sinclair Refining Company, and Harkness and under their immediate instruction, and with their knowledge, consent and by permission, and under the direction and supervision, actually selling and delivering Sinclair products to a filling station under lease and being operated by the said Sinclair Refining Company, all of which was in the regular course of his employment.

"8. Your petitioner avers that the said George Fellows had stopped his truck at the filling station hereinabove referred to, which is located on the north side of the said highway just west of the point of the hereinafter alleged accident, and that he drove his truck in a southeasterly direction across said highway, preparatory to driving said truck in an easterly direction along the said highway.

"9. Your petitioner avers that he was operating the said Ford Roadster in a careful, prudent and skillful manner, and that the said automobile was properly equipped with standard brakes, which were in excellent condition and that said automobile was being driven on its right or north side of said highway at a speed of not more than forty-five miles per hour and that your petitioner at all times maintained a proper lookout for traffic on or about said highway.

"10. Your petitioner avers that when he was within a short distance of the said filling station that the said George Fellows without regard for traffic on the said highway, in utter disregard of the safety of others, particularly your petitioner, and without giving any notice, signal or warning, carelessly and negligently drove the said truck out from the said filling station as above alleged, onto the said highway, so that the said truck completely blocked the north half of said highway, which was the portion of said highway immediately in front of your petitioner.

"11. Petitioner avers that immediately on seeing the said George Fellows drive the said truck onto and across the said highway blocking the northern portion thereof, he realized the situation and contemplated turning in a southerly direction, but seeing an automobile approaching from the west which blocked this path or the southern portion of said highway, he applied his brakes, and seeing he was too close on the automobiles to stop, turned in a northerly direction, off the said paved highway and onto the graveled or dirt part thereof, where the shoulder and ditch were so rough and rugged that petitioner lost control of the said Ford Roadster and ran into a post connected with the said filling station located just north of said highway."

As appears from these quoted allegations, the gravamen of plaintiff's complaint is that Fellows carelessly and negligently, under the circumstances, drove his truck upon and to the center of the concrete portion of the highway, which action forced plaintiff, in order not to ram the truck head-on, to abandon the concrete and take to the shoulders of the road; that on account of the rough surface of the shoulders, he lost control of his car and ran it into the corner post of the filling station which Fellows had served immediately previous. He was injured in the collision, and sues for damages on this account, for doctor's, medical, and other bills and expenses incurred in the treatment of his injuries.

The accident is admitted by all defendants. Harkness admits that he was employed by the oil company as a commission agent receiving a commission on all its products sold and delivered by him, but denies that, in hauling, selling, and delivering said products, he acted on behalf of his company, but on his own account; that said products sold and delivered were hauled by his own agents and not by any agent of the oil company. He denies that the money collected in payment of sales of said products belonged to the company, or that work done by him and his employees in selling and delivering said products was carried on, as alleged by plaintiff, for the use, benefit, profit, and gain of the company; that George Fellows was his employee and was to no extent under the control, management, or supervision of the oil company. He admits that Fellows was operating the Chevrolet tank truck involved in the accident, owned by him (Harkness), to deliver the products of the company, which had been delivered to him to sell on a commission basis. He denies that the filling station where the accident occurred was leased by the company, and denies that it was the owner of said Chevrolet truck or the tank thereon. He also denies that plaintiff was operating his car in a careful and prudent manner, but on the contrary, it was being driven at the time of accident and immediately prior thereto at a rapid, reckless, and unsafe rate of speed, in view of existing circumstances and conditions, and specially denies that he maintained a proper lookout for traffic on said highway. Any negligence charged against Fellows is also denied.

He avers that before Fellows undertook to go upon the highway from the station, he looked in an easterly direction for approaching traffic, and saw and heard none; that before he reached the highway, he looked to the west for traffic, and, observing a car approaching from that direction (his right), he brought the truck to a stop, partially on the north side of the highway, and, while waiting for the car to pass, the car driven by plaintiff appeared from around the curve toward the east (his left), driven in the manner aforesaid. He denies that plaintiff, as by him alleged, saw Fellows drive the truck upon the highway, but on the contrary avers that the truck had been brought to a stop before plaintiff's car appeared in sight. He admits that, to avert a collision with the truck, plaintiff drove his car off of the concrete, on his own right-hand side, but avers that the accident occurred because plaintiff was driving the car too rapidly, and did not have it under proper control at the time.

In the alternative, the contributory negligence of plaintiff, in that he failed to

maintain a proper lookout, and operated his car at a reckless and careless rate of speed, in view of the circumstances existing at the time, is pleaded in bar of his right to recover; and he further pleads that plaintiff had the last clear chance to avoid the accident for the reason that he could have brought his car to a dead stop on the highway before reaching the truck, after discovering its presence, if he had not been traveling at excessive speed at the time and under the circumstances; that the accident was due solely to the gross negligence and carelessness of plaintiff.

Fellows' answer and defenses therein urged is practically the same as that of Harkness.

The answer of the Sinclair Refining Company in substance and effect is the same as that of Harkness, with some minor exceptions. The same defenses are urged. This defendant avers that Fellows, as he started to drive upon the highway from the station, saw plaintiff appear from the east at an excessive rate of speed, and thereupon immediately stopped the truck to allow him to pass, but for some unknown reasons, at a point more than 100 feet east of the truck, he swerved the car to his right and off of the highway, and so continued until striking the station. This defendant specially pleads that Harkness was only its commission agent, operating under a contract, and that George Fellows is not and never has been its agent or employee; that it at no time exercised any supervision or control over him or Harkness in the operation of any automobile owned by either of them; that Fellows is unknown to it in any transaction by it had with Harkness.

While the trial of the case was in progress, a copy of the contract between Harkness and the oil company was produced, and filed in evidence by plaintiff. The company then filed an exception of no cause and no right of action to plaintiff's suit against it. The exception was sustained and the suit dismissed as to the exceptor. This left only Harkness and Fellows as defendants.

On the merits plaintiff's demands were rejected and his suit dismissed. He appealed from this judgment and from the judgment sustaining the exception filed by the Sinclair Refining Company.

Before entering upon a discussion of the facts of the case at time of and immediately preceding the accident, we deem it best that the geography of the situation at and about the site thereof be described. The filling station where the accident happened is on the Dixie-Overland concrete highway leading from the city of Monroe to Shreveport, La. It is six miles from Monroe, and faces south. The road there (concrete part) is 18 feet wide with shoulders. The two posts supporting the roof of the station are 21 feet north of the concrete. About 650 feet east of this station the road grade declines gradually to a point about halfway to the station and from this point on towards the station the grade inclines gradually and curves slightly to the north or right as you travel west. The average grade of the highway covering the depression is 3½ per cent. The point where the grade begins to rise is probably 6 or 7 feet lower than the ends of the 650-foot tangent. An automobile approaching from the east may be seen by one at the station when 600 feet away. At the date of the accident, a ditch some 2 feet deep, contiguous to the north shoulder of the highway, extended to within 50 feet of the station. The surface of the ground from the west end of this ditch to within a few feet of the east post of the station was cut up by deep ruts and holes.

Plaintiff was driving a Ford roadster, accompanied by a male companion, traveling at a rate of speed variously estimated at from 35 to 45 miles per hour. We think he was making not less than 40 miles per hour when the emergency arose out of which the accident resulted. As he approached the station, he sounded the car's horn long and loudly. It was distinctly heard by people living on both sides of the road, a distance of as much as 300 feet from him. He saw the truck at stop, servicing the station, when 300 feet therefrom, and proceeded on, keeping his side of the highway, not reducing his speed any, assuming, as he had the right to do, that his path of travel would not be obstructed by any movement of the truck. At this juncture it is well to discuss the movements of Fellows and the truck. He says he only drove the truck 2 feet upon the concrete before the collision, but the fact is admitted by Harkness, and testified to by several other witnesses, that the right front wheel of the truck was only 2 feet from the black or meridian line of the paved part of the road when it stopped. This wheel was 58 feet from the post which plaintiff ran into. Fellows' actions at the time, and the reason why he did not observe plaintiff ap-

proaching him on the east, are clearly reflected from his own testimony, viz.:

"Q. Where was your truck when it stopped? A. About two feet up on the edge of the highway.

"Q. Now did you move your truck any from that position before Mr. Goff's car passed the truck and ran off the road and into this post? A. No, sir.

"Q. In other words, when you got your truck, you say about two feet on the pavement you stopped and looked both ways? That right? A. Yes, sir.

"Q. And you didn't see Mr. Goff coming but saw this other car coming from the west at a high rate of speed and you knew he had to pass so you stood there for him to pass? A. Yes, sir.

"Q. Did you sound your horn before you started upon the highway? A. Sound my horn?

"Q. Yes? A. No, sir.

"Q. Did you have your motor running when you got in that truck or did you have to start it after you got in? A. When I first got in my truck?

"Q. Yes? A. It was not running. I had to start it.

"Q. You had to start it? A. Yes, sir.

"Q. Did you hear any horns blow? A. Sir?

"Q. Did you hear any horns blow as you stopped upon the pavement? A. No, sir, didn't hear any horn blow.

"Q. You hear a horn blow at all? A. Yes, sir.

"Q. When? A. When Mr. Goff blowed his horn I was looking this way at this gentleman passing. When he blew his horn it called my attention and I looked this way and he was passing my truck,—behind my truck.

"Q. He was passing your truck then? A. Yes, sir. I was watching the car going east. I was standing still, was not moving at all."

This testimony clearly discloses that Fellows' attention was entirely directed towards the car coming from the west (his right), and that he was not paying attention to traffic conditions to his left as he should have done at the time. While servicing the station with gas, the truck's motor was not running. He started it and drove the truck diagonally southeasterly some 50 feet and stopped it when the front wheels were near the middle line of the

road, one-half of the 18-foot truck, approximately, extending northwesterly off of the concrete while the balance of it completely occupied plaintiff's side of the concrete; and at this moment, and under these conditions, a car, coming at a rapid rate from the west, was sufficient excuse for plaintiff not trying to drive past the stationary truck on his own left side of the road. Confronted with this dilemma, when not more than 50 or 60 feet from the truck, plaintiff adopted the only alternative open to him. He drove his car's right wheels off of the pavement when 41 feet from the truck's rear end and continued to thus drive until very close to the truck and then left the concrete entirely, cutting further to his right to avoid collision with the truck. To accomplish this he necessarily turned the car at an angle to the right, entered upon the rough road above the west end of the ditch and proceeded towards the station. He undertook to pass to the south of the east post of the station, and would have doubtless succeeded but for loss of control of his car, in whole or part, while passing over the rough and rutted surface of the ground back of the truck. The right front end of the car collided with the station post, knocked it down, and then ran into a gas pump a few feet west.

It was Fellows' intention to return to Monroe when he left the station. He was then on the north side of the highway. He wanted to get on the south side and head east. The duty clearly rested upon him not to undertake crossing the highway until traffic conditions justified him attempting to do so. The duty devolved upon him to look both ways for traffic before trying to regain the opposite side of the road. Evidently he did not do this. He only looked to the west, and, seeing a car approaching from that direction, focused his attention upon it, taking care not to cross the black line. The road to his left was open to his sight for over 200 yards. He should have seen plaintiff's car and heard the repeated sounds of its horn. He failed to exercise that prudence and care required of him by law. His negligence is actionable. It was the proximate, if not the sole, cause of the accident.

Act No. 296 of 1928, was in effect when this accident happened. Section 21 (a) thereof lays down this rule, viz.: "The driver of a vehicle entering a public highway from a private road or drive shall

yield the right-of-way to all vehicles approaching on such public highway."

■ When this law is violated, as was done in the present case, all presumptions are against the offender, and, as was said in Armour & Co. v. Hicks Co., 18 La. App. 504, 138 So. 676, 677: "He assumes the risk of his experiment and is required to use greater care than if he had kept on the right side of the road." Potter v. Glassell, 146 La. 687, 83 So. 898; Berry on Automobiles (6th Ed.) Vol. I; page 237.

■ It is contended that plaintiff should have been able to have stopped his car before striking the station post, and that because he was unable to do so argues convincingly that he was driving at an excessive rate of speed. The testimony does not warrant concluding that plaintiff was traveling over 45 miles per hour, which was lawful at the time and place. It is shown that the brakes on his car were in good condition, and skid marks on the concrete road, east of the truck, disclose that the brakes were applied as testified to by plaintiff. The bouncing of the car after getting on the rough ground evidently caused release of the brakes, or rendered application thereof ineffective. It must be assumed, under such circumstances, an operator of a car, so far as his mental and physical faculties will allow, will leave nothing undone to avert collision that may result in his own death. On the other hand, no one is expected to exercise that calm deliberation and accuracy of decision in the face of an emergency as would be expected of him under normal circumstances. The distance in which an automobile may be deliberately stopped when driven at a given rate is not a safe criterion to be judged by in case of emergency.

■ We do not think the plea of contributory negligence tenable, or that the application of the doctrine of last clear chance finds place in the case. Pope v. Locascio, 13 La. App. 304, 126 So. 727, 729; Kennedy v. Opdenweyer, 11 La. App. 532, 121 So. 636, 123 So. 906; Smith v. Interurban Transp. Co., 5 La. App. 704.

■ The oil company claims that Harkness' relation to it is that of independent contractor and, therefore, it is not responsible for his negligence or that of his servants or employees. The lower court ruled in favor of this position on the face of the written contract between the parties. This contract is quite lengthy. We shall incorporate herein only those provisions of it which, in our opinion, bear upon or are pertinent to this issue, to wit:

"For the mutual considerations hereinafter named the party of the first part (hereinafter referred to as the 'Company') employs the party of the second part (hereinafter referred to as the ('Agent') to act as its agent in the territory described on the reverse side with his headquarters at Monroe, State of Louisiana, and the Agent hereby accepts such employment subject to the terms set forth as follows:

"1. The Agent shall receive, care for and sell, exclusive of other similar products, the oils, lubricants and other products (herein referred to as 'products') that the Company supplies for sale, and shall deliver and collect for all products thus sold, it being understood that all such products shall remain the property of the Company until sold and that the proceeds therefrom shall be the property of the Company and subject to its orders; and without additional charge therefor shall assist in making collections of such accounts in his territory as the Company may deliver to him for that purpose, including those accounts specified herein.

"2. The Company shall specify the prices at which products entrusted to the Agent shall at all times be sold.

"3. Unless otherwise directed the Agent shall make daily deposit of all collections in the bank designated by the Company, and shall each day secure and transmit evidence of such deposit in the form of receipted deposit slip, certificate of deposit or cashier's check, as the Company may direct; and shall on the following days or dates, Daily Except Sundays & Holidays, or as often as the Company may direct, report all sales, collections, deposits and remittances on forms provided by the Company, such report to show sales, collections, deposits and remittances made from date of last previous report to and including date of current report.

"4. The Agent shall submit to the Company an inventory of all products remaining on hand on the last day of each month, or on such other business day as the Company may direct for closing monthly business.

"5. The Agent shall send all reports, evidences of deposit, remittances, inventories, and correspondence to the Company

458

at Fort Worth, Texas, except as otherwise directed by it.

"6. The Agent shall obtain prompt return from customers of all shipping barrels (heavy steel drums) and furnish strict accounting thereof, and of all light iron barrels returned for credit by customers, reporting the number to be credited to each customer by name; and shall make such disposition of all containers as the Company may direct.

"7. The Agent shall not extend credit to any customer without first securing permission in writing from the Company so to do, and shall withdraw any credit so extended when so directed by the Company. The Agent shall be liable to the Company for any loss sustained through violation of these provisions. The Company is authorized, at its option, to charge the Agent with the invoice value to customers of products delivered in violation of such provisions, and shall have the right to deduct and retain for its own use said invoice value from any monies that may then be due or which thereafter may become due the Agent; and such deductions shall be construed and accepted as payment of commissions hereunder.

"8. The Agent shall at his own expense furnish necessary teams, trucks, motive power, drivers, labor, water, light, power, and heat, and shall also pay all necessary expenses in draying the Company's products and equipment and in making sales, deliveries, and collections. The Agent shall also at his own expense apply for in his own name and have installed at his headquarters a telephone which shall be listed in the proper telephone directory and other directories in the name of Sinclair Refining Company with the street address of Agent's headquarters. All charges for local and long distance calls made by means of such telephone, whether such calls be of a business or private nature, shall be for the account of the Agent, and the Company shall not in any case be obligated to pay any such charges or to reimburse the Agent for any payments so made; provided, however, that the Company may pay any such charges and deduct the amounts so paid from any commissions then due or thereafter to become due the Agent.

"9. Agent shall be responsible for, and hereby assumes all responsibility for, any and all acts of Agent's employees, whether they be acts of commission or omission, resulting in loss or damage to the Company, and Agent hereby agrees to indemnify, save harmless, and reimburse Company for and on account of any such acts of Agent's employees.

"10. The Agent shall be liable to Company for any demurrage or storage charges assessed by the Railroad owing to his neglect to promptly unload and release tank cars and other railroad cars, or to take out merchandise shipments consigned to his station.

"11. The Agent shall: (a) perform his duties in a business-like manner; (b) employ no improper, questionable or illegal methods in soliciting or securing business; (c) observe the price schedules of the Company and its rules and instructions applicable to agents and any special instructions given him by the Company; (d) make reports and transmit information to the Company at the time and in the form and manner required by it; (e) do nothing detrimental to the business standing and best interests of the Company; (f) exercise due vigilance in protecting the equipment, property, and products of the Company, notifying it promptly in writing of any condition which may arise requiring its attention."

Either party had the right at any time to terminate the contract without cause.

For his services, Harkness was to receive a fixed compensation, based upon the quality and quantity of products delivered by him to customers. A schedule of commission rates is embodied in the agreement.

It seems clear to us that the oil company simply hired Harkness to sell, deliver, and collect the price of its products. He had to have assistants to enable him to make deliveries promptly to the oil company's customers. The amount of compensation earned by him depended upon the quantity and quality of goods sold and delivered by him, as agent, to customers who could pay cash therefor, or whose credit was satisfactory to his employer. He had not the right to sell to any one without the written consent of the company; if he violated this rule any loss following therefrom was to be absorbed by him. He could not fix any price on the goods he was empowered to sell. He was not free to act independently. He had a routine of business to follow, and in doing this he was almost entirely controlled by his company, even to the manner of depositing and remitting money collected by him for his

principal. The power to control the acts of an employee is one of the first tests as to whether or not he is independent. He was required to have installed in his headquarters a telephone which should be listed in the directory in the name of the oil company with his street address. He was chargeable with cost of all calls. It is true the truck operated by Fellows belonged to Harkness, but the tank thereon was owned and furnished by the oil company on which was painted in large letters the word "Sinclair." The station where the accident occurred was under lease to the oil company.

It will be noted that in stipulation 9 of the contract, quoted above, Harkness, as agent, agreed to be responsible for any and all acts of his employees, whether they be acts of commission or omission resulting in loss or damage to the company, and he further agreed "to indemnify, save harmless, and reimburse the company for and on account of any such acts of the agent's employees." If Harkness was an independent contractor, the company, with few exceptions, would not be responsible for the acts of his employees. It is not improbable that this stipulation was incorporated in the contract out of an abundance of caution, realizing, perhaps, that the agent who operated thereunder would be held not to be an independent contractor, but a servant. It is not enforceable against nor binding upon third persons injured through the negligence of those engaged by the agent or servant to assist him in carrying on the master's business.

Viewing the issues in the case in the light of and under the evidence before us, our opinion is that the exception of no cause and no right of action filed by the oil company was improperly sustained; but as the exceptor introduced no evidence at all on trial of the case, we do not wish to be understood as holding finally that Harkness was not an independent contractor of the oil company, and therefore responsible for the negligence of Fellows, Harkness' employee. On this issue the oil company is entitled to be heard. The question is left open. And should we now hold finally that Harkness was not an independent contractor of the company, which we do not do, no final judgment could be rendered against it on the merits because it had been dismissed from the case at inception of trial on the merits.

The situation is such that the case will have to be remanded for new trial on all the issues not closed by the following decree.

For the reasons assigned, the judgment appealed from is hereby annulled, avoided, and reversed; and there is now judgment in favor of plaintiff and against F. T. Harkness and George Fellows decreeing that they are in solido bound unto and responsible to him, said plaintiff, for all damages sustained by him as a result of the accident herein discussed; and for said reasons the case is hereby remanded to the lower court for new trial as between plaintiff and the Sinclair Refining Company on all issues in the case; and for the further purpose of allowing the lower court to determine the amount of damages plaintiff is entitled to recover on account of injuries received in said accident, and to award judgment therefor; all in keeping with the views herein expressed.